Ericsson Inc.  Mr. McAndrews, you reserved four minutes of your time for rebuttal. Yes, Your Honor. And Mr. Josepher and Mr. Lowes, did I pronounce your names correctly? Yes. You're going, Mr. Josepher, you're going to go first for nine minutes, and Mr. Lowes, you're going second for six. Is that correct? Yes, Your Honor. Okay. All right. You may proceed. Good morning, Your Honors. May it please the Court. This proceeding consolidates appeals from three IPRs directed to two patents. It's the Howard 353 and 079 patents. The distinction across the three matters may matter in some instances, but for the most part, the issues I want to address today are addressed to an issue that crosses all three matters. The Howard patents describe wireless communications in which a signal is transmitted in two portions. The first portion is transmitted at a predetermined bandwidth and contains an indication of the operating bandwidth of a further portion of the signal. The further portion is then transmitted at the indicated operating bandwidth. Again, most of the issues on appeal will rise and fall with the construction related to indication of operating bandwidth. It appears in all of the independent claims that were challenged here. Now, the Board held that all claims were unpatentable, all challenge claims were unpatentable, based on a construction of an indication of operating bandwidth. Does it case rise and fall whether indication means a specific identification of some sort? Your Honor, yes, that's one of the issues. That was essentially the proposed construction of the patent owner, that indication of operating bandwidth identified a particular bandwidth. There were some procedural errors here. There is a problem with the construction. Is there a thing in the specification that would support that? Yes, Your Honor. My understanding of your spec was you have a chip rate. You send a chip rate over, and then from that chip rate, you can calculate and determine what would be an ideal frequency range operating bandwidth. And that isn't the same thing as sending over in the header a specific frequency range. Your Honor, I agree that what's contained in the header is not the operating bandwidth. It is an indication of the operating bandwidth of a plurality of bandwidths, as the claim says. The specification of the Howard patents tells us, though, that that chip rate also serves as an indication of a particular bandwidth because as, for example, Howard, the 079. I guess that's what I'm trying to understand about your understanding of the claim when it comes to identification of a particular bandwidth. Yes, Your Honor. Is it your understanding that that must mean that in the header, in that first portion of the signal, it's actually specifying frequency X to frequency Y? So the header itself does not contain the frequencies. The header itself, as required by the claim, requires an indication of what you're describing of the frequency range. And that's done in the Howard patents. For example, this is on Appendix 426. It's column 8, lines 26 through 32 of the Howard patents. It says, since this indicated chip rate, so that's the indication. The chip rate. The chip rate indicated is higher than the low chip rate. And then I'm going to skip forward to the relevant language here. Once that's received, it's configured into a second state in which the analog section 360 and the digital low pass filter are set to bandwidths appropriate for the higher chip rate. And so the device, the specification, is describing the device that knows that a priori. It knows the bandwidth that it will use for the indication. If the reconfiguration at that high chip rate is for the appropriate bandwidth, then why does it matter that it be identified with any type of specificity? Why isn't it enough that reconfiguration can take place? Well, it's only that it takes place based on the indication. It's not that there is some information of any kind that may have some relation to bandwidth, and then somehow that is figured out in some way. Maybe there's some additional processing that occurs, and then you arrive at the bandwidth that the receiver sets itself at. It's that that serves as effectively indication. It's effectively a pointer to a specific bandwidth that the receiver will use. That's what's meant by it will be set to the bandwidth appropriate for the higher chip rate. It's not describing anything else that's required. It knows, which is different from the prior art. The prior art doesn't do that. The prior art, in some instances, has things that are associated with bandwidth, but it doesn't describe actually changing anything. It doesn't describe using anything that is a bandwidth, a particular bandwidth based on what is sent in the signal. I want to return to the reason why I believe that the record is unclear below on this is there is a fundamental problem with the construction that the board arrived at. It was a construction that the parties never argued, and so this wasn't fully sorted out in the board's decisions whether what was being sent by the prior art actually indicated bandwidth. Let me go back. It's the indication that is in the claims. The board's construction did not actually require that it include an indication of bandwidth. The board's construction merely requires that the signal is received, and we can see that throughout the proceedings, including the final written decisions, the questions by the board during the oral argument. Why doesn't the board's claim construction track how the chip rate works in your specification in the sense that the construction says an indication of the operating bandwidth means it needs to supply a sufficient amount of information so that the receiver can reconfigure itself in order to set itself up for an appropriate bandwidth range for receiving the data that's coming in? Well, so the construction actually doesn't quite say that, Your Honor, and so let me give a hypothetical system that maybe will bring home what's wrong with the board's claim construction. So the board's claim construction is the first signal portion contains sufficient information so that when it's received, the receiver is able to configure itself to receive the data portion of the signal or further signal portion or transport channel at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter. It doesn't say at approximately the same frequency range or bandwidth indicated by the indication. It's just saying you receive what you got, and so hypothetically, we have a system that has a fixed bandwidth. We have a fixed bandwidth in the system, so picture this. The first portion of the signal that's sent in that system indicates that the signal's going to be QPSK rather than BPSK, and the receiver needs to know that to know how to decipher the information. And that's the low chip rate. QPSK or BPSK actually does not impact chip rate. It merely impacts the modulation format used, and the parties are in agreement that changing from QPSK to BPSK would not impact bandwidth in any way. You can receive QPSK and BPSK at exactly the same bandwidth and get two different data rates, but it does not impact bandwidth. And so my point here is the first portion of the signal indicates something that is necessary that is used to allow the received circuitry to receive the information. And it just so happens that received information is received going back to the board's construction. It's received at approximately the same frequency range or bandwidth at which it's been transmitted by the transmitter. Well, of course it is because it could only be sent at a single bandwidth. It's a self-fulfilling prophecy. I throw you a blue ball, you have to catch the blue ball. So you're not making your particularity argument anymore? What I'm pointing out is I'm pointing out the distinction between, and I apologize, I think the question was what is the difference between our proposed construction and the board's construction. Yes. And so, yes, I am pointing out that the board's construction does not require any particularity. In fact, it does not even require that the indication include… Well, it comes in and it goes out approximately the same frequency, really close approximately the same frequency because otherwise it wouldn't be received and transmitted. It would be useless. Again, not necessarily true, Your Honor. Picture a system that the receiver has a wide open bandwidth and what is transmitted is a narrower bandwidth. It will be received. It will be received. Your construction is identification of a specific or a particular bandwidth. Correct, Your Honor. Right. And under that construction, which we believe to be the proper construction, as a starting point, Erickson never put on a case with respect to that construction. So if that's the proper construction, we believe it is, we believe it's supported by the intrinsic record, it's supported by the plain language of the claim, Erickson never put on a case directed to that. But you would agree if the bandwidth that is specifically identified as appropriate for the reconfiguration of the device and the board's construction would capture that and be correct? The board's construction? Yes. The board's construction, Your Honor, is too broad though. Well, that's my point. It only requires approximately the same range of bandwidth. You want it to be the identification of the actual specific bandwidth. And it seems to me, even if that's the case, if you identify a specific bandwidth, if it causes a reconfiguration on the other end, it's also an appropriate bandwidth. But the problem is that the board's construction does not require reconfiguration in any way that has anything to do with bandwidth. Sure it does. It says the receiver is able to configure itself to receive the data. To receive the data portion of the signal. And going back to my example, that would be the case when you're indicating something that has nothing to do with bandwidth. For example, QPSK versus BPSK. And then where the construction really breaks down is the second portion. It says at approximately the same frequency range or bandwidth at which it has been transmitted by the transmitter. That is not at the same frequency range or bandwidth that has been indicated by the indication. And we know that the board, that's what they meant because they emphasized it in the footnote to the construction. They say the key consideration is that the receiver is able to receive the data that the transmitter transmits. That's the key. As long as it receives it, we don't care what the indication actually told us. As long as it's received, therefore there must have been enough in there to tell us the bandwidth. But again, it's not necessarily true. There are systems that accept all signals regardless of what's sent. There are systems that have a fixed bandwidth ahead of time or a bandwidth... How does all of, I mean, we're getting, for me, we're getting a little bit into an abstract land here. And what I want to know better is why doesn't something like McFarland disclose an indication of an operating bandwidth when we know that McFarland teaches including both the number of carriers and the symbol rate in McFarland's header, which are used to then reconfigure that filter so it can receive the data portion in McFarland. Your Honor, actually McFarland is the perfect example of why the board's claim construction matters. So the parties argued and there was a factual dispute over whether McFarland's header... Is symbol rate the same thing as a chip rate? Not necessarily. Chip rate tends to refer to a spread spectrum system that tends to have a single carrier. So not necessarily. Symbol rate in a multi-carrier system refers to the rate at which you are sending a single bit of data. It can be multiple bits of data per carrier, but that's a... But if you had the symbol rate and the number of carriers, shouldn't you be able to figure out the operating bandwidth? Not necessarily because you don't have the carrier spacing, which is a necessary component. But what if McFarland said that the carrier spacing is proportional to the symbol rate? And it may say that. It says it's proportional, but that doesn't... Simply being proportional doesn't tell you what that specific carrier spacing necessarily is or that... For example, it can be a multiple, it can be off by percentages and still be adequate to receive the signal. There is no direct relationship between symbol duration, symbol rate, and carrier spacing. You're running close on your... You're running out of time. Can you address before you sit down the due process argument? Yes, Your Honor. Very briefly, the due process argument is that the claim construction that the board provided had not been argued by any party. And let me jump forward just because you may have a question about that, and it may come up here. Maybe I'll cover it in rebuttal, but the sections of the record before the board that the appellees cite to are plainly not directed to that construction. They're directed, first of all, to a different claim element. And that different claim element, they're not even proposing a construction. They are explaining what, for example, Trom Power does once you presume that Trom Power has received the indication of operating bandwidth. So it's pretty plain that the petitioners, the appellees, did not argue for that claim construction. So when the claim construction comes out for the very first time, it's not a construction that the parties ever argued in the case below. It comes out in the final written decision for the first time without any notice that's coming. Patent owner, appellant, simply had no opportunity to address that. And the SASV Compliment Soft case speaks to that. The Google reply brief didn't articulate it? I'm sorry, Your Honor. The Google reply in that particular CBM. I thought they did pretty clearly articulate this conception of this particular claim term. Your Honor, the Google – First, you're the first one that tried to create a construction for this. Because at the petition stage, nobody suggested that there needed to be a claim construction for this particular claim term. Then in the patent owner response, this is where we come up with the identification of a particular bandwidth construction by you. Google comes back and says, no, that's not the right construction. It's really the right construction and understanding of this, as you can see by our proposed prior art objections, is that you look at whether the header has sufficient information so you can figure out how to reconfigure the receiver to receive the data portion. So it's – at a minimum, that's – you know it right then and there. And then you talk about it, the oral argument. Your Honor, you're correct. The claim construction was not addressed head on at the institution stage, and so we're not complaining that it wasn't addressed prior. We're okay if the petitioners had in their reply provided a proposed construction. Then we could have reacted – if they provided a proposed construction, we could have reacted, for example, with asking for a SIR reply to address that proposed construction that not had been previously provided. But let me go to the language that Google says. So Google, first of all, says no construction is necessary. Plain and ordinary meaning applies. The only thing they say – and by the way, the board says Google didn't tell us what that plain and ordinary meaning was, other than to say the receiver can determine a frequency range used to transmit the further signal based on information provided by the indication. So even Google is embracing a construction that would require that the further signal portion have something to do with what is provided by the indication. The board's construction, again, does not even embrace that. So Google's – to the extent that you want to treat that as a construction, that's not the construction the board used to take away IV's patent rights, which we believe violates due process. Okay. Thank you very much. Thank you. Mr. Joseph, you have nine minutes, and I'll give you additional time if you need since the other side had additional time if you need it, okay? Well, thank you, Your Honor, and may it please the court. To try to be less abstract, as one of the questions went to, I think it's helpful just to focus on the fact that IV is arguing that the prior art references are inadequate in two respects. Disclosure of carrier spacing and disclosure of the specific upper and lower frequency bounds. A lot of the other claim construction discussion I'm happy to talk about, but it doesn't really matter beyond those two points. And the second of those points, disclosure of specific upper and lower frequency bounds, IV never argued that before the board. And in their brief in this court, they said, well, we can raise it now for the first time in this court because it's relevant to the board's claim construction. But the board expressly said it was not even opining on the question of whether you needed specific upper and lower frequency bounds. So the only thing before the court really with respect to indication of an operating bandwidth is whether there needs to be a disclosure of carrier spacing. And on that point, we know the basic point there is simply that the indication of an operating bandwidth does not have to take any specific form or be of any specific type, much less disclose anything as detailed as carrier spacing. We know that for a couple of reasons. First, the plain and ordinary language of indication. Indication is obviously a broader term, a bigger term. And second, when you go to the specification, and this was Judge Chen's point, the only embodiment of an indication provided in the specification is chip rate. And everyone agrees that chip rate is not bandwidth. And everyone agrees, and this was the testimony of Ivy's expert, that determining bandwidth from chip rate is complicated and depends on a variety of parameters. So from that, we know for certain that the indication of an operating bandwidth— Chip rate's not bandwidth, but chip rate can provide an indication of bandwidth. Yes. Is this correct? And the reason it can do that is that it provides information relevant to determining the appropriate bandwidth. The receiver would take that and take other information already known to the receiver in order to then come up with the appropriate bandwidth. Am I correct here that the high chip rate that follows the chip is what indicates what the bandwidth is going to be or should be, the appropriate bandwidth? Yeah, I was thinking it was reversed. But in terms of the specification, there's the first portion of the signal is at the one chip rate, and then you switch over to the other chip rate for the second portion of the signal. The receiver configures itself according to the second, the high chip rate. It configures itself to the second chip rate so that it can receive it at the relevant— Or it configures itself to the bandwidth that is appropriate for that chip rate. I mean, they are different. Bandwidth and chip rate are not the same. One doesn't by itself tell you the other. You need other information. The receiver would know the other information. And that's important, then, because under any construction, really, beyond the higher-level construction points, both McFarland and PIERSCA cover this. And for McFarland, the board relied on IV's concession, the crucial concession, that the receiver would know the chip rate. Otherwise, there's no—excuse me. I'm sorry. That the receiver would know the carrier spacing. So in McFarland, the signal, the indication, provides everything you need to know to determine bandwidth except for carrier spacing. The receiver already knows the carrier spacing. What that means is that the signal that McFarland is sending out is then sufficient to identify specifically the appropriate bandwidth based on the other information it knows, which is exactly how the specification works with chip rate. And with PIERSCA, PIERSCA is similar to McFarland in this respect, and it also has Figure 15B, which expressly discloses an example where the carrier spacing is known. And then in the relevant part of the specification describing Figure 15B, it describes how to go about determining the carrier spacing. So what this means is that you have—the prior references work in basically exactly the same way as the specification does. Because—and this is the key point—it's the indication of the operating bandwidth plus other information already known to the receiver that allows the receiver to specifically identify the appropriate bandwidth. Can you talk a little bit about the due process concern the other side has about being surprised by the claim construction that the board arrived at in the final written decision? Certainly. And there are a couple points there. First, obviously the board was not required to adopt any party's claim construction verbatim. But what it did adopt was a claim construction that in the relevant part, at least, is comparable to what Google and Erickson had been arguing all along. Google's proposed claim in ordinary meaning, for example, argued that—and this is, for example, in Google's—well, Appendix 153 is where the board quotes it, but Google said that the indication of an operating bandwidth encompasses determining the frequency range used to transmit the further signal portion based on information provided by the indication. So the indication provides information that allows the receiver to determine the frequency range. Now, that's phrased in terms of the transmitter because Google is mostly concerned about the claims, the talk in terms of the transmitter, not the receiver. But it's the same point, substantively. The IP's argument seems to be that they take the board's construction to require just that there be information in the indication and that the receiver works, period, that there's no nexus between the two. But that's not a reasonable construction of the board's construction because the point of the board's construction is that the indicator provides sufficient information so that the receiver can reconfigure itself. The question here is whether the parties had an adequate opportunity to address the board's construction because it was late in the day, wasn't it? Well, the board announced its interpretation in the final decision because claim construction was first disputed in the answer in the reply. So that was the first opportunity the board would have had to address it. Since the petition stage, no one was seeking a claim construction. During the time you filed your petition and your reply, you changed your argument on motivation to combine Dolman and McFarland. Did you specifically disavow the first argument? Judge Wallach, I'm sorry to have to say this, but I represent Google, and because that's an Erickson-only question, I hate to say it, but Erickson does have to address the Erickson-specific questions. They can do that soon. But in terms of the fair opportunity, if claim construction was first raised in the answer, Google and Erickson then addressed it in their replies. It was addressed again in oral before the hearing, and the construction that the board ultimately adopted is in relevant part comparable to what Google and Erickson had been arguing. So that's why it's very hard to see any due process issue. I would also point out that even as of now, there's been no demonstration of prejudice. It was never identified, if it had known the precise wording of the ultimate claim construction, what arguments or evidence that would have presented differently, and the reason is that it wouldn't have. There's no material substantive difference. There's no discussion yet of the one versus two filters issue. I don't know if the court would like to briefly hear on that, but the simple point is that the claim language requires a filter for one function and a filter for another function. But consistent with background norms of patent law, it does not require that multiple structures be used to satisfy the multiple limitations. And we know that in a couple of respects. One, the claim language doesn't specifically require separate structures. Doesn't the claim use the verb are, A-R-E? Yes. Filter one, filter two, are reconfigurable? Right. In common usage, are is oftentimes used to refer to something that could be either singular or plural. So, for example, there are one or more books on the shelf, one or more judges on the court. Or you could have rewritten one of these claims to say where in the first and where in the one or more filters are reconfigurable. Or my favorite, if my kids are arguing about whether they like Batman or Bruce Wayne better and someone said I like Batman and Bruce Wayne, or I think Batman and Bruce Wayne are both great, that R would refer to. Obviously, Batman and Bruce Wayne are the same person. It's just you could say in different configurations. But in any event, the board's point about R is that – I'm sitting here thinking what they really say is myself R. Which, well, they do like themselves. But the board's point about R, though, I think the board had the key point, which is that you still have to read all the intrinsic evidence in the whole. And at a minimum, the use of the verb are, which can be used to denote either singular or plural, it doesn't speak directly expressly to the point. Whereas the specification does spot on say that what's necessary is either providing different filters or reconfiguring the filter, the single filter. And then in that point, it's this filter with an S in parentheses at the end, making it really clear as one or more filters. We're using the broadest reasonable interpretation here, right? As well. And also in context, this is what you would expect. Because in the computer context, if you have a circuit in one filtering configuration, you then reconfigure the circuit into a different filtering configuration. In a very real sense, you then have two filters, just as a programming computer makes a new computer, as the court explained it now with that. So you wouldn't expect there to be a requirement for two separate structures, and the specification confirms there's not. Okay, thank you. Mr. Lowes? Well, Mr. Lowes, come out from under the bus you were thrown under and answer my question. Yes, Your Honor. Indeed, in the petition, we did make the combination of McFarland as modified by the Dahlman's reference teaching of the UMTS system. And then in response to the arguments raised, we explained that while that combination of the teachings is appropriate in practice, making a physical combination, the UMTS system is already implemented. So you're saying you didn't abandon the first one? Not at all, Your Honor. Okay. We just explained how it would physically be implemented just to demonstrate the combination. The idea is McFarland is a specific type of transmitter on a wireless network. Dahlman is a particular kind of wireless network, UMTS. And so the combination of this interesting transmitter in McFarland with the UMTS network is kind of basic. So whether you're talking about one combined with the other or the other combined with the one, you can readily see what the combination is supposed to look like. Yes, Your Honor. And I think the board explains itself when they're developing what is the level of skill in the art. They look both to the declarations of the experts, Dr. Haas and Dr. Zeger, as well as the references themselves. And they make findings that the person of ordinary skill in the art would know about the use of UMTS node B systems, would know about the spread spectrum technology of UMTS, would also know about OFDMA. And so they find that the person of skill in the art already has this base knowledge about applying those and then add on to that that it's easy to modify. The person of skill in the art knows how to modify those different schemes to achieve those results. What about the due process concern? I guess I.D. is saying that they never really urged a particular claim construction, at least the one that was specifically adopted by the board. Nor could I.D. really tell from the content and context of what you were arguing in terms of your proposed projections where they could see and understand what you thought indication of an operating bandwidth meant so that they were surprised at the end when the board adopted that. What's your response to that? I think that the record is clear that the indication of operating bandwidth is really used three times in the claims. Claim 14 of the 353 patent is probably the best because it has both a transmitter component as well as the receiver logic for recovering the indication and then further logic for recovering the information at the indicated bandwidth. In the analysis of that, applying, for instance, the Trone Power reference, which they complain that the board applied a portion of Trone Power that wasn't previously cited for that. That's incorrect. It was actually cited for Claim 14 for the logic for recovering, and that's at APPX 4050 on to 4053. But it's in the application of those elements for both Trone Power, McFarland, as well as Peerska that as you walk through and say there's the indication and then the claim requires that that indication be used and it's applied to the references, it's clear that each of the references recovers that indication from the header and then reconfigures its filters or system to receive the remainder of the portion at the indicated operating bandwidth so it can recover the data at the higher data rate. Is there anything further? No, I think that's it. Okay, very good. Thank you very much. You get two minutes, Mr. McAndrews. Thank you, Your Honor. Let me address kind of in reverse order there. So the issue of whether the specific section of Trone Power, this is an additional due process issue. The specific section of Trone Power, which is column 33, was never addressed with respect to indication of operating bandwidth. It was thrown in to discuss what would happen in a dependent claim when filters are reconfigured. It's a dependent claim issue. It was never cited. This is an issue where the patent owner needs to be put on notice of what portions of the prior references are being relied on to put together the case of obviousness or anticipation. Under in-rate magnum oil tools, the board is not free to then go take the prior record and create their own case of unpatentability, and that's what happened with that section of Trone Power. It was never cited for the purpose of that section of the independent claim. It was only for the dependent claim, different element. There's alternative rejections here, though, right? I mean, we could potentially affirm without ever addressing Trone Power. That's correct, Your Honor. That's correct. But at least with respect to Trone Power, we believe that that particular issue violated due process. Did you raise due process arguments with respect to Trone Power? Yes, Your Honor, we did. In our brief, if you want to pinpoint it. It's okay. Yes, we did raise this as a separate, distinct issue on due process. This was more, rather than a claim construction, this was an application of a section of the prior that had not been previously cited for the proposition that the board ultimately arrived at. On the two-filter issue, just briefly, the argument by Google's attorney was that R is used when you say one or more. Well, that's not the claim language that was chosen by the patent applicant here. The patent applicant specifically used a filter describing a filter of a certain kind and then a filter again. And in common patent parlance, for antecedent basis issues, you would use the if you're referring back to the same filter. And it is true that the preferred embodiment describes two different embodiments. There's two different embodiments. You can use two different filters or you can use a single filter. But the patentee has a choice of claiming something narrower, of course, than its preferred embodiment. And that's what was done here. It says a filter, a filter, and then it uses the term R. It is not the unusual situation where you need to come up with the right word when you say one or more. That's not what the claim said. If that's what the patentee had intended, they would have said one or more filters. Briefly back to the McFarland, I want to try to make clear one last time why the board's construction is important. And it's seen in the discussion of McFarland in the board's decisions. The board decides that McFarland necessarily discloses an indication of operating bandwidth because it assumes that there is fixed carrier spacing. And when there's fixed carrier spacing, it is true that when you multiply that by the number of carriers, you wind up with a bandwidth. Maybe it's not necessarily the indicated bandwidth, but set that aside for a second. It is true. But the board made that up. That was not an argument that the petitioners made. The board made that up because it examined I.V.'s attorney during the course of oral argument, not based on an argument previously made. And it said, isn't it true that the signal is received? Isn't it true that it knows where carrier one is, et cetera? And the answer is, well, yes, it does. But that's not necessarily the case because bandwidth was indicated. It can be the case, for example, you have a system like my system that's been described as hypothetical. And I did characterize it that way. But it's really an embodiment of the McFarland system. In the McFarland system, you can negotiate ahead of time that I'm going to use this much bandwidth. Then all I need to have, so my bandwidth is going to be this going forward. Then in the first signal portion, I receive an indication of the number of carriers. Then what I do is I fill that space with those number of carriers. The carrier spacing doesn't have to be known ahead of time. We know it's not in the indication. Nobody's argued that it's in the indication. It's not there. But it can be filled after the fact. And that's consistent with McFarland's purpose of taking into consideration things like multipath and other types of interference where you have tradeoffs between the number of carriers and the symbol rate given how much bandwidth is available to you. And it makes sense that you would negotiate that available bandwidth ahead of time because it's the receiver that knows how much bandwidth is available, not the transmitter. Any questions? Thank you very much.